**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

**Civil Action No. 12-cv-01891-MSK**

**In re: TERRY KENNETH VICKERY**

       **Debtor.**

**RICHARD K. DIAMOND, Chapter 7 Trustee for IVDS Interactive Acquisition Partners, L.P., a Florida general partnership,**

       **Plaintiff/Appellee,**

**v.**

**TERRY KENNETH VICKERY,**

       **Defendant/Appellant.**

---

### OPINION AND ORDER ON APPEAL

---

**THIS MATTER** is before the Court on appeal from the Bankruptcy Court's June 5, 2012 order and judgment in favor of the Plaintiff Richard K. Diamond, finding that a $4.6 million judgment debt is nondischargeable under 11 U.S.C. § 523(a)(6). In determining this matter, the Court has considered the designated record and written arguments of the parties, including the Debtor's Opening Brief (**#12**), Mr. Diamond's Response (**#14**), and the Debtor's Reply (**#25**), as well as supplemental briefing submitted by the parties (**#35, 36, 39**).

Exercising jurisdiction pursuant to 28 U.S.C. § 158, the Court **AFFIRMS** the Bankruptcy Court's judgment.

### I.  PROCEDURAL BACKGROUND

In 1995, IVDS Interactive Acquisition Partners (IIAP), a Florida general partnership, filed for bankruptcy protection in the Central District of California under Chapter 11. The case

was converted to Chapter 7 and the Plaintiff, Mr. Richard K. Diamond, was appointed Chapter 7 trustee.  In that case, Mr. Diamond, as Trustee, initiated an adversary proceeding (hereinafter, the IIAP Adversary Proceeding) against the Debtor, Mr. Terry Vickery, and others.  Mr. Diamond asserted claims for fraudulent transfer and conspiracy, and sought to recover money that have been transferred from IIAP to the Debtor and the other defendants.  The IIAP Adversary Proceeding culminated in a 2007 judgment in favor of Mr. Diamond and against the Debtor and other defendants in the amount of $4.6 million plus interest.

Later, the Debtor filed for bankruptcy protection under Chapter 7 in the District of Colorado.  Mr. Diamond initiated the instant adversary proceeding against the Debtor, seeking to except from discharge the judgment debt arising from the IIAP Adversary Proceeding under 11 U.S.C. § 523(a).  Mr. Diamond argued that the judgment debt is nondischargeable because it was (1) a debt for funds obtained "under false pretenses, false representations or actual fraud" under § 523(a)(2); (2) a debt for "fraud and defalcation, while acting in a fiduciary capacity to [IIAP]" under § 523(a)(4); and/or (3) a debt for "willful and malicious injury to [IIAP] and its property" under § 523(6).

After a trial, the Bankruptcy Court found in favor of the Debtor on the first two claims (that is, that the debt is dischargeable under § 523(a)(2) and (4) ), and for Mr. Diamond on the third claim that the debt was excepted from discharge under § 523(a)(6).  Mr. Diamond appealed the Bankruptcy Court's determinations on the first two claims to the Bankruptcy Appellate Panel for the Tenth Circuit (BAP).  The Debtor appealed the third determination under § 523(a)(6) to this Court.  This Court stayed its determination of the Debtor's appeal until after the BAP ruled.  The BAP now having ruled, the appeal is ripe for determination.

## II.  DISSCUSSION

The Debtor raises two issues on appeal.  First, did the Bankruptcy Court abuse its discretion in denying his motion to withdraw admissions that were deemed admitted pursuant to Fed. R. Civ. P. 36(a)[1]?  Second, did the Bankruptcy Court err in finding that the judgment debt arose from a willful and malicious injury and is therefore nondischargeable under § 526(a)(6)?

### A.  Denial of Request to Withdraw Admissions

On September 29, 2011, Mr. Diamond served the Debtor with requests for admission together with other discovery requests. The Debtor failed to timely respond, as a consequence the requests for admission were deemed admitted  pursuant to Rule 36(a)(3).[2]  Then, in January 2012, Mr. Diamond filed a motion for summary judgment on his claim under § 523(a)(2), basing the motion, in part, on the admissions.  The Debtor, who at all times was represented by counsel, moved for an extension of time to respond to the motion for summary judgment, asserting that his failure to reply to the requests for admissions had "slipped between the cracks" and that he would promptly respond to them.  Some two weeks later, the Debtor responded to the requests for admission, and requested to withdraw the admissions.  (He failed to respond, however, to the remaining discovery requests that were served on September 29, 2011.)

The Bankruptcy Court denied both the motion for partial summary judgment and the motion to withdraw admissions.  With regard to the motion to withdraw admissions, the Court found that the admissions would not hinder the presentation of the merits of the case and that Mr.

---

[1] Rule 7036 of the Federal Rules of Bankruptcy Procedure adopts Fed. R. Civ. P 36 in adversary proceedings.

[2] Under Rule 36(a)(3), a matter in a request for admission is deemed admitted unless, within 30 days after being served, the party to whom the request is directed responds with a written answer or objection.

Diamond would be faced with difficulties in preparing his case if the admissions were withdrawn.

Pursuant to Rule 36(b), a court "may" permit withdrawal or amendment of admissions if (1) "it would promote the presentation of the merits of the action," and (2) "if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits."   The rule establishes a two-part test, both prongs of which must be satisfied in order to permit the court to exercise its discretion to allow the withdrawal or amendment of admissions. *Raiser v. Utah County*, 409 F.3d 1243, 1246 (10th Cir. 2005).  The first part of the test "emphasizes the importance of having the action resolved on the merits, and is satisfied when upholding the admissions would practically eliminate any presentation of the merits of the case." *Id.*  The prejudice referred to in the second part of the test relates to the difficulty a party may face in proving its case.  For example, the unavailability of key witnesses, due to the sudden need to obtain evidence with respect to the matters previously deemed admitted. *Id.*  This Court reviews the Bankruptcy Court's decision to deny withdraw of admissions under Rule 36(b) for an abuse of discretion. *See Bergemann v. United States*, 820 F.2d 1117, 1121 (10th Cir. 1987).

The Court sees no abuse of discretion.  With regard to the first Rule 36(a) factor, the Bankruptcy Court considered the admissions in ruling on Mr. Diamond's motion for summary judgment and determined that even if the admissions were allowed to stand, the evidence did not establish the elements of his claim under § 523(a)(2).  The matter therefore proceeded to a full trial on the merits.  Further, the Debtor never argued that the admissions were relevant to Mr. Diamonds claims under § 523(a)(4) or (a)(6).  He argued only that if the admissions were allowed to stand, the Court might grant summary judgment on the claim under § 523(a)(2).  The Court ruled otherwise and denied summary judgment.

4

With regard to the second factor, the Bankruptcy Court did not specify what difficulty Mr. Diamond would have faced had the admissions been withdrawn, stating only that "[t]he difficulty presented [to Mr. Diamond] in attempting to prepare for trial at this late stage, if admissions are withdrawn, is obvious."  The Court noted that there were only 35 days left before trial and that the Debtor had waited to move to withdraw the admissions until after the discovery deadline had passed and without responding to the additional discovery requests, which would have assisted Mr. Diamond in gathering support for any matters not admitted.  Although Mr. Diamond certainly would have been inconvenienced by withdraw, the prejudice contemplated by Rule 36(b) requires the party who obtained the admissions to show more than a mere inconvenience in having to prove the matters at trial.  *See Raiser*, 409 F.3d at 1246.  Here, it is unclear that withdrawal would have presented Mr. Diamond with any particular difficulty in proving his case.  Nevertheless, because the Debtor failed to satisfy the first factor of the Rule 36(b) test, the Court finds that the Bankruptcy Court did not abuse its discretion in denying his motion to withdraw admissions.

Even if this Court assumed the existence of an error, any error would be harmless.  The Debtor admits on appeal that the admissions relate to only "irrelevant" matters and that they were not relied on by the Bankruptcy Court in deciding any issue in this case.  He states that he raises this issue simply in anticipation that Mr. Diamond *might* rely on the admissions in his arguments on appeal.  No such argument was made before this Court, and this Court does not rely solely on the admissions in resolving whether the Bankruptcy Court erred in its determination of nondischargeability.

## B. Dischargeability under § 526(a)(6)

The following undisputed facts, relevant to the determination on dischargeability, are derived primarily from the Bankruptcy Court's June 5, 2012 Findings of Fact, Conclusions of Law, and Ruling.

In 1994, the Federal Communications Commission announced that it would be issuing licenses to operate interactive television systems in particular geographic markets. An auction was to be held in the summer, at which interested parties could bid on the licenses. In April of that year, Carlo Anneke and David Dambro formed IIAP for the purpose acquiring some of the FCC licenses. Mr. Anneke acted as the original general partner of IIAP. Mr. Dambro took no ownership interest or management title in IIAP, but he was the catalyst in bringing together all the parties with the expertise needed to raise funds for IIAP, and he was the person in charge of the venture. Mr. Dambro brought on board attorney Perry West, as well as Doug Mallach, who was associated with Digital Interactive Associates, Inc. (DIA). Mr. Mallach's title was "consultant" to DIA, but in reality, he was in charge of all aspects of DIA's day-to-day operations.

In order to acquire the FCC licenses, IIAP needed to raise capital. Mr. Dambro, Mr. Anneke, and Mr. West agreed upon a $6 million fundraising goal and hired DIA to do the fundraising. DIA was a "telemarketing" firm, whereby its sales representatives would contact individuals and solicit investments from them. Upon signing a partnership agreement, the investors became "partners" of IIAP. All funds raised by DIA were initially deposited in DIA's account, with the proceeds to be distributed as directed by IIAP. Before fundraising began, Mr. Drambo, Mr. Anneke, and Mr. West agreed that the $6 million raised by DIA would be

distributed as follows: 40% ($2.4 million) to be retained in escrow for the benefit of IIAP; 20%

($1.2 million) for sales commissions to be paid to sales people and managers; 15% ($900,000) to

be retained by DIA for marketing expenses; and 25% ($1.5 million) to be retained by DIA for

"G&A" expenses.  Mr. Anneke thought that $2.4 million was a reasonable sum for IIAP to

acquire some "good" FCC licenses and for nominal initial operating costs.  This funding plan

was approved at IIAP's initial partnership meeting where Mr. Anneke acted as the initial general

partner.  The meeting was also attended by Mr. Dambro and Mr. West.

The Debtor, Mr. Vickery, knew Mr. Dambro and Mr. Mallach from prior business

ventures.  As the venture was forming, they asked him to become involved with IIAP and DIA.

The Debtor became the President and sole shareholder of DIA at the request of Mr. Dambro and

Mr. Mallach.  However, Mr. Dambro and/or Mr. Mallach retained the option to acquire the

Debtor's ownership interest in DIA at any time.  The Debtor's role in DIA was limited to sales

operations and supervision of the 30-40 sales associates who contacted potential investors.

Though nominally the Debtor was the President and sole shareholder of DIA, the corporation

was in fact controlled by Mr. Dambro and Mr. Mallach.

DIA in turn hired Market Dynamics Group (MDG) and Market Logistics Group (MLG)

as consultants.  MDG was a company controlled by Mr. Dambro.  He was the President and sole

shareholder of MDG.  During the time that DIA was fundraising for IIAP, Mr. Dambro's full-

time job was "consulting" with all the parties involved with IIAP.  According to Mr. Dambro,

MDG had a verbal contract with DIA to contribute Mr. Dambro's expertise, consulting, and

marketing, and support for whatever amount of time was necessary.  MDG's compensation was

to be a flat fee of whatever was "left over" after the payment into escrow for IIAP and of all

other expenses of fundraising.  MLG was a company controlled by Michael Dambro, David

Dambro's brother.  MLG provided DIA with "leads" or lists of potential investors who could be contacted by DIA's sales representatives.

The Debtor was aware of the funding plan that was set up by the initial partners of IIAP. He was aware that under the plan, DIA would ultimately retain 60% of the funds raised, which funds were earmarked for sales commissions, operations, and consulting expenses.  There was no written agreement between IIAP and DIA concerning the funding plan and distributions.

Over the course of eight months, from April through December, 1994, DIA succeeded in raising $6 million from approximately 640 investors who were each required to invest a minimum of $6,000.  All of the money raised for IIAP was initially deposited into DIA's bank account.  By the end of December 1994, DIA had transferred $2.4 million into escrow for the benefit of IIAP.  It had also disbursed $3,561,729.94 for various categories of IIAP and DIA expenses.  Of this nearly $3.6 million, MLG received transfers of $325,941.91 for "advertising and promotion."  DIA received $882,665.03 and MDG received $569,319.99 for "consulting fees."

Meanwhile, in July 1994, IIAP, through Mr. Anneke, purchased three FCC licenses for a total of $6 million with a down payment of $1.2 million and the balance to be paid over five years.  However, after paying the down payment and having paid out nearly $3.6 million in operating expenses, IIAP was left with insufficient funds to make the remaining payments to the FCC or to build out the infrastructure needed to operate the systems authorized by the licenses. A year and a half later, IIAP filed for bankruptcy.

In the IIAP Adversary Proceeding, Mr. Diamond sought to avoid and recover $3.6 million in transfers to the Debtor and other defendants under 11 U.S.C. § 544.  He argued that

the transfers were fraudulent and therefore voidable under Florida law.[3]  Further, Mr. Diamond claimed that he was entitled to punitive damages because the Debtor and other defendants had allegedly conspired to cause IIAP to transfer the funds and that they acted willfully and with actual malice or wanton disregard of IIAP's creditors.

After a jury trial, a verdict was returned in favor of Mr. Diamond on all claims.  The jury found that $3.6 million was fraudulently transferred by IIAP and that the defendants conspired to cause IIAP to make the transfers to them or for their benefit.  The jury also answered "yes" in response to three interrogatories as to whether the Debtor had acted maliciously, oppressively, and in reckless disregard of IIAP creditors' rights.  As a result, the jury awarded $1 million in punitive damages against the Debtor individually and additional amounts against the other defendants.

In this case, Mr. Diamond asserts that the judgment debt is nondischargeable under 11 U.S.C. § 523(a)(6).  After a trial, the Bankruptcy Court found in favor of Mr. Diamond on that claim.  The Court found that, based on the evidence at trial, the Debtor was a "knowledgeable and willing" participant in a plan to raise $6 million for IIAP and to transfer $3.6 million to himself and others.  The Court noted that the evidence showed that the Debtor took intentional actions to further the plan and that he acted with "knowledge that the transfer of $3.6 million by IIAP to himself and the other defendants [] was certain to injure IIAP by depriving IIAP of funds to which it was entitled."  The Court also found that the Debtor knew that the transferees of the $3.6 million were receiving more than they were entitled to receive based on the services they

---

[3] Mr. Diamond asserted three claims that the transfers were fraudulent under the Florida Uniform Fraudulent Transfer Act (FUFTA): (1) under FUFTA § 726.105(1)(a), based on evidence that the transfers were made with the actual intent to hinder, delay, or defraud IIAP; (2) under FUFTA § 726.105(1)(b)(i), based on evidence that IIAP's assets were unreasonably small in relation to what was required to satisfy its obligations; and (3) under FUFTA § 726.105(1)(b)(ii) based on evidence that at the time of the transfers, IIAP intended to incur, or should have believed that it would incur, debts beyond its ability to pay.

provided to IIAP, and that he intended for the transferees to receive such amounts.  The Court concluded that because the judgment debt was the result of the intentional actions and injury to IIAP by the Debtor and his co-conspirators, the debt is nondischargeable under § 523(a)(6).

In reviewing the Bankruptcy Court's determination of dischargeability, this Court applies the same standards of review as in other cases involving appellate review of bench rulings. *See In re Unioil, Inc.*, 962 F.2d 988, 990 (10th Cir. 1992); *Davidovich v. Welton (In re Davidowich)*, 901 F.2d 1533, 1536 (10th Cir. 1990).  Thus, questions of law are subject to *de novo* review, while findings of fact may be set aside when they are clearly erroneous.  A finding of fact is clearly erroneous if it is without factual support in the record or if, after considering all of the evidence, the reviewing court is left with the "definite and firm" conviction that a mistake has been made. *In re Miniscribe Corp.*, 309 F.3d 1234, 1240 (10th Cir. 2002); *Conoco, Inc. v. Styler (In re Peterson Distributing, Inc.)*, 82 F.3d 956, 959 (10th Cir. 1996).

11 U.S.C. § 523(a)(6) states that any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is not dischargeable.  This statute refers only to acts done with the actual intent to cause injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).  Nondischargability under § 523(a)(6) requires proof of both a willful act and a malicious injury. *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004).  A "willful act" is one in which the debtor must desire to cause the consequences of his act or believe that the consequences are substantially certain to result from it. *Id.* at 1129.  A "malicious injury" occurs when there is proof that the debtor either intended the resulting injury or intentionally took action that was substantially certain to cause the injury. *Id.*  The test for this element is a subjective one: the Court must determine what the debtor knew or intended with respect to the consequences of his actions. *Id.*  Wrongful intent may be established by direct evidence of

specific intent to harm a creditor or the creditor's property. *In re Longley*, 235 B.R. 651, 657 B.A.P. 10th Cir. 1999) (citing *CIT Financial Services, Inc. v. Posta*, 866 F.2d 364 (10th Cir. 1989)). Intent may also be established indirectly by evidence of both the debtor's knowledge of the creditor's rights and the debtor's knowledge that the conduct will cause particularized injury. *Panalis*, 357 F.3d at 1129 (citing *Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek*, 983 F.2d 1524 (10th Cir. 1993)). The creditor bears the burden of establishing nondischargeability by a preponderance of the evidence. *Holaday v. Seay (In re Seay)*, 215 B.R. 780, 785 (10th Cir. BAP 1997).

The Debtor argues that the Bankruptcy Court clearly erred in finding that the judgment debt resulted from a willful and malicious injury. He contends that there is no evidence to support a finding that he intended to injure the IIAP partnership. Mr. Diamond responds that the record supports the Court's findings. Alternatively, Mr. Diamond asserts that the issue of the Debtor's intent was previously determined by jury in the IIAP Adversary Proceedings and therefore the doctrine of issue preclusion (collateral estoppel) applies. The Debtor argues that the collateral estoppel cannot apply because no evidence of the IIAP Adversary Proceedings was introduced at trial and because the Bankruptcy Court previously considered the issue on summary judgment.

The Court first addresses the issue of collateral estoppel. Despite the Debtor's arguments to the contrary, there was no need for evidence of the IIAP trial to be introduced in this matter. The underlying facts with regard to what the jury did are not in dispute, and the question of whether the doctrine of collateral estoppel applies is a legal one. Thus, if the jury  necessarily

decided that the Debtor's caused "willful and malicious injury" to IIAP, then that finding would be binding here under the doctrine of collateral estoppel.[4]

However, having reviewed the jury's verdict in the IIAP Adversary Proceeding, the Court finds that collateral estoppel does not apply. The jury in the IIAP Adversary proceeding found that the Debtor and the other defendants conspired to cause IIAP to make fraudulent transfers to them and that they acted "maliciously," "oppressively," and in "reckless disregard of [IIAP creditors'] rights." None of these findings meets the standard of "willful and malicious injury" set forth under § 523(a)(6). Debts arising from reckless injuries do not fall within the scope of willful and malicious injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). With regard to "oppressively," the jury was instructed that they could find an act "oppressive" if the person who performed it "injures or damages or otherwise violates the rights of plaintiff with unnecessary harshness or severity." The Bankruptcy Court found that the fact that the Debtor acted with unnecessary harshness or severity does not necessarily mean that he intended any specific injury upon IIAP. This Court agrees.

With respect to the definition of "malicious," the jury was instructed that "[c]onduct is malicious if it accompanied by ill will or spite or if it is for the purpose of injuring another." Because the instruction was given in the disjunctive form "or," the jury's finding could have been based on a finding that the Debtor acted with "spite" or "ill will," neither of which establish that the Debtor intended a specific injury upon IIAP. Thus, the jury's finding of malicious does

---

[4] In order for collateral estoppel to apply, the following elements must be present: (1) the issue previously decided is identical with the one presented in the instant action, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party to or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action. *Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 978 (10th Cir. 1995). It is undisputed that the second, third, and fourth elements are met in this case.

not necessarily equate to a finding that the Debtor intended a "willful and malicious injury" within the meaning of § 523(a)(6).

The Court therefore turns to the record in this case to determine whether it supports the Bankruptcy Court's findings.  The Debtor makes much of the fact that there is nothing in the record to support the finding that he and the other defendants received more than they were entitled to, based on a lack of a written or verbal agreement.  However, whether the defendants received more than they were entitled to *was* previously determined in the IIAP Adversary Proceeding.  The jury found for Mr. Diamond on all of his fraudulent transfer claims and it further found that the Debtor and others participated in a conspiracy to cause IIAP to make such transfers in the amount of $3.6 million.  Thus, the issue is simply whether by participating in the conspiracy the Debtor intended specific injury upon IIAP — that is, to deprive it of money to which it was entitled.

Having reviewed the record as a whole, the Court sees no clear error.  The record supports the Bankruptcy Court's finding that the Debtor acted with knowledge that that the transfers were "certain to injure IIAP by depriving IIAP of funds to which it was entitled."  The evidence establishes that the Debtor was well aware of the IIAP financing scheme by which DIA would retain 60% of the raised capital, regardless of actual expenses, and that he willfully participated in that scheme by making various distributions to himself and others.  The record also shows that the Debtor (as the sales supervisor of DIA) did not disclose to potential investors (partners) that 60% of each dollar they contributed was already earmarked to be retained by DIA, MLG, and MDG, regardless of actual expenses.  Further, the Debtor was aware that $2.4 million was insufficient for IIAP to build out the systems necessary to operate the FCC licenses.  This was not disclosed to potential investors either.  The failure to disclose such material information

supports an inference that the Debtor knew that the IIAP financing scheme was not in the best interests of the individual partners or the partnership.  Thus, the record supports a finding that the Debtor knew or should have known that the funding scheme that he participated in would result in the IIAP partnership being deprived of $3.6 million that rightfully belonged to it.

### III.  CONCLUSION

For the forgoing reasons the Court **AFFIRMS** the judgment and the Bankruptcy Court's determination that the $4.6 million judgment debt held by Mr. Diamond is nondischargeable under § 523(a)(6).  The clerk shall close this case.

Dated this 26th day of January, 2015.

BY THE COURT:

Marcia S. Krieger
Chief United States District Judge